UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:13CR334 JAR (SPM) |
| JERRY CARTER, | ) |
| Defendant. | ) |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

In accordance with the Memorandum filed herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Doc. No. 32) and Motion to Suppress Pursuant to *Franks v. Delaware* (Doc. No. 54) be **DENIED.**

**IT IS FURTHER RECOMMENDED** that the United States' Motion for Pretrial Determination of the Admissibility of Defendant's Statements, pursuant to 18 U.S.C. §3501, should be granted and Defendant's statements should be deemed admissible at trial (Doc. No. 21).

The parties are advised that they have **fourteen (14)** days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Trial in this case has been set on **June 23, 2014,** at **9:00 a.m.** before the Honorable John A. Ross.

/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this 13th day of May, 2014.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) ) ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:13CR334 JAR (SPM) |
| JERRY CARTER, | ) ) ) |
| Defendant. | ) |

# **MEMORANDUM**

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). On September 5, 2013, the United States filed a Motion for Pretrial Determination of the Admissibility of Defendant's Statements pursuant to 18 U.S.C. § 3501 (Doc. No. 21). On December 9, 2013, Defendant filed a motion to suppress evidence and statements. (Doc. No. 32), which the United States opposed (Doc. No. 34). An evidentiary hearing was scheduled for January 2, 2014. Thereafter, Defendant requested, and was granted, four continuances of the evidentiary hearing. (Doc. Nos. 37-38, 44-45, 47-48, 50-51).

On March 27, 2014, I held an evidentiary hearing on Defendant's motion to suppress evidence and statements. (Doc. No. 32). However, at the time of the hearing, neither party presented any witnesses. Instead, defense counsel indicated that deposition testimony taken in a parallel state court case may support a finding by this court that Defendant is entitled to a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Defense counsel requested, and was granted, until April 7, 2014, to submit the relevant deposition testimony together with a supplemental brief on the issue. The parties agreed that the suppression motion could be decided on the written submissions of the parties unless the court decided Defendant was entitled to a *Franks* hearing.

On April 7, 2014, Defendant filed a motion to suppress pursuant to *Franks v. Delaware,* with a supporting memorandum. (Doc. No. 54). On April 14, 2014, the United States filed its response to the same. (Doc. No 56). In addition to its responsive brief, the United States submitted a copy of the warrant affidavit (Doc. No. 56-1); results from computer searches regarding *State of Missouri v. Jerry Carter*, St. Louis Circuit Court Case No. 22931-00721-01 (Doc. No. 56-2); the December 20, 2013, deposition testimony of Officer Lawrence O'Toole (Doc. No. 56-3); and the December 20, 2013, deposition testimony of Officer Michael Kegel (Doc. No. 56-4).

Based on my review of the written submissions of the parties, I make the following factual findings and conclusions of law.

## FACTUAL FINDINGS

### A. The Search Warrant

On May 24, 2013, St. Louis City Circuit Judge Thom Clark issued a search warrant ordering the search of Defendant's residence located at 5622 Delmar Boulevard, Apartment 310, in the City of St. Louis, Missouri (the "Residence"). The warrant was supported by an affidavit signed by St. Louis Metropolitan Police Department ("SLMPD") Detective Lawrence O'Toole (the "Affidavit"). Detective O'Toole attested that the information in the Affidavit came from information provided by an anonymous source, a confidential informant, and corroborating surveillance, as well as other investigative means.

Specifically, the Affidavit provides that on May 21, 2013, Detective O'Toole received information from an anonymous source that Defendant was selling controlled substances from, and possessed handguns inside, the Residence. In a deposition taken on December 20, 2013, Detective O'Toole identified the anonymous source referenced in the Affidavit as a source who

had been working with the Drug Enforcement Administration ("DEA") as part of a federal investigation. *See* Doc. 56-3, at pp. 49-53 & 75.

The Affidavit further provides that Detective O'Toole and another SLMPD Detective, Michael Kegel, were advised by a confidential informant (the "CI") that the CI had been inside the Residence and observed Defendant in possession of illegal controlled substances and a firearm. The Affidavit states that the detectives also personally met with the CI, who identified Defendant in a photograph and explained, in detail, how s/he purchased illegal controlled substances from Defendant at the Residence. The Affidavit further states that information provided by the CI "in the past has led to several cases being successfully prosecuted in both the State of Missouri and Eastern District of Missouri (Federal) jurisdictions."

In the Affidavit, Detective O'Toole further attests that he performed a utilities check on the Residence to confirm that it was Defendant's residence and that he conducted a computer inquiry of Defendant's criminal history which revealed, among other things, that Defendant was a convicted felon, having been convicted of Murder 1st and Armed Criminal Action. Finally, the Affidavit attests that Detective O'Toole conducted surveillance of the Residence on May 21, 22, and 23, 2013, during which he observed Defendant engage in what appeared to be hand-to-hand drug transactions.

### B. Execution of the Search Warrant[1]

It is undisputed that the search warrant was executed on the Residence on May 29, 2014, and Defendant was subsequently taken into custody. The following items were seized pursuant to the search warrant and Defendant's arrest: a loaded Taurus make, 85 model, .38 special caliber revolver with a defaced serial number; scales; one coffee grinder; one box of sandwich bags; one

---

[1] The facts in this section are the uncontested facts set out in the United States' brief in opposition to Defendant's motion to suppress (Doc. No. 34) and Defendant's motion to suppress based on *Franks v. Delaware* (Doc. No. 54).

3

cellophane bag containing what was believed to be cocaine base ("crack"); another clear cellophane bag containing what was believed to be heroin; yet another cellophane bag containing what appeared to be marijuana; a cell phone; a magnetic key box; bills and other documentation connecting Defendant to the apartment; a prescription bottle containing various pills; and $721.35 in cash.

### C. Statements by Defendant

Defendant's initial motion to suppress asked the court to suppress statements made during the search and following Defendant's arrest. Although the court directed defense counsel to specify the statements Defendant sought to have suppressed, defense counsel failed to do so. The only statement the United States identified as a statement it may attempt to introduce at trial is a statement officers allegedly overheard while they searched the Residence. Specifically, in its brief opposing the suppression motion, the United States proffered that evidence would show that while officers were searching the Residence, Defendant's girlfriend was overheard asking Defendant, "Is everything going to be ok?" Defendant was overheard replying, "No, baby, everything is not going to be ok. They just got me with a gun."[2] The United States also proffered that Defendant was advised of his *Miranda* rights and stated he understood; and when asked if anyone was inside the apartment, Defendant responded that his "girl" was in the rear bedroom and his dog was inside its cage in the living room area. Defendant has not contested any of the foregoing proffered evidence.

---

[2] In its response to the initial motion to suppress, the United States indicated that after Defendant was advised of the search warrant, Defendant denied that he lived at the Residence. However, the United States indicated that it did not intend to offer that statement at trial.

**D. Deposition Testimony of Detectives O'Toole and Kegel**

On December 20, 2013, Defendant's counsel in the parallel state action took the depositions of SLMPD Detectives O'Toole and Kegel. Defendant's federal counsel and an investigator from the Federal Public Defender's office ("FPD") were present.

During the deposition, Detective O'Toole testified that Defendant became a target of his investigation on May 21, 2013, when a DEA agent, Scott Marlow, advised O'Toole that DEA had a source (the "DEA Source") who was making "controlled buys" from Defendant.[3] Marlow relayed information from the source to O'Toole about Defendant, including Defendant's name, address, pedigree information, and that the source had been making controlled buys from Defendant. *See* Doc. No. 56-3, at pp. 46-47.[4] O'Toole testified that he eventually met the DEA Source. Indeed, later on May 21st, and again on May 22nd, O'Toole went along with the DEA agents when the DEA Source made other controlled buys from Defendant. *Id.* at pp. 49-52. O'Toole admitted that he did not specifically reference the controlled buys in his search warrant affidavit because the DEA did not want its separate federal investigation to be publicly disclosed at that time. *Id.* at 52-53.

After observing two controlled buys between the DEA Source and Defendant, Detective O'Toole spoke with his partner, Detective Kegel, and briefed him on the information he had received, including Defendant's nickname of "Nephew." Kegel then contacted the CI, who lived in the area. The CI indicated that he knew "Nephew." Doc. No. 56-3, at p. 53. Thereafter, Kegel and O'Toole met with the CI and showed him a photograph of Defendant. The CI identified Defendant as "Nephew". *Id.* at p. 54. O'Toole testified that the CI corroborated the information

---

[3] Detective O'Toole explained that a "controlled buy" is when law enforcement officers "provide the informant with an amount of currency to buy an amount of narcotics." Doc. No. 56-3, at p. 49:2-5.

[4] References to page numbers are to the page numbers of the deposition transcript.

he had received from the DEA Source; namely, the CI verified that Defendant lived at the Residence; that Defendant was selling narcotics; that Defendant would not sell narcotics from inside the location if his girlfriend was present; that Defendant was selling marijuana, crack cocaine, and heroin from the apartment; and that Defendant was armed with a firearm. *Id.* at pp. 53 & 65-66.

O'Toole also testified that Detective Kegel had used the same CI in past investigations that had led to successful state and federal prosecutions. *Id.* at p. 55. O'Toole denied that he and Kegel made any promises to the CI but acknowledged that because the CI had been involved in past cases, he would have been aware that there was an opportunity for him (the CI) to make some money if the investigation was successful. *See* Doc. No. 56-3, at p. 56.

O'Toole testified in some detail about the surveillance he did prior to seeking the search warrant. *See id.* at pp. 58-62; 64-65; 68-73. More specifically, O'Toole testified that he conducted surveillance on May 21st and 22nd with DEA agent Scott Marlow and another detective. On May 21st, Detective O'Toole observed a controlled buy between Defendant and the DEA Source. During the controlled buy, O'Toole was about twenty yards away and was positioned where he could see what was actually transacted. *Id.* at p. 61-62. O'Toole saw the fruits of the controlled buy when the DEA Source came back. It appeared the source had bought heroin from Defendant. *Id.* at p. 68-69. Similarly on May 22nd, O'Toole witnessed a controlled buy/hand-to-hand drug transaction between the DEA Source and Defendant. Also on May 22nd, O'Toole observed what he believed to be a second hand-to-hand drug transaction between an unknown third person and Defendant. *Id.* at p. 69-71. Indeed, O'Toole testified that the DEA Source was present during the second transaction with the unknown third party and was able to confirm to the officers that the third party "did, in fact, make a buy" from Defendant. *Id.* at p. 71.

Detective O'Toole also testified that he conducted surveillance on May 23rd with Detective Kegel. O'Toole testified that when he conducted surveillance with Detective Kegel on May 23rd, he observed what he believed to be a hand-to-hand drug transaction in front of the Residence between Defendant and an unknown third party.

Detective Kegel's testimony regarding the investigation leading up to the search warrant was consistent with O'Toole's testimony. *See* Doc. 56-4. For instance, Kegel testified that when he returned to duty after a day off, O'Toole explained the investigation he was working on. Kegel recognized the nickname "Nephew" from a discussion he had a few days prior with the CI. *See* Doc. No. 56-4, at pp. 40-41. Before Kegel learned about O'Toole's investigation, the CI had been advising Kegel that he (the CI) had been able to purchase quantities of heroin from a guy named Nephew who lived right around the block from the CI on Delmar. After talking to O'Toole about his investigation, Kegel figured the person the CI had told him about was the same person O'Toole was investigating. *Id.* at p. 41.

Kegel subsequently made contact with the CI and, together with O'Toole, went to meet with the CI. O'Toole and the CI compared notes, and it sounded to Kegel like they were both describing the same building. *Id.* As O'Toole and the CI were talking, O'Toole showed the CI a photograph of Defendant and asked if this is "the guy you know as Nephew?" The CI said "yes, it was." *Id.* at p. 42. Kegel confirmed that the CI told him and O'Toole about how he got in contact with Defendant and the logistics of his drug purchases. *See id.* at p. 43. Kegel also testified that on May 23rd, the CI told him that he (the CI) had been inside Defendant's Residence, and that he had seen Defendant in possession of cocaine, heroin, and a handgun. *Id.* at p. 46. Finally, Kegel testified that on May 23rd he and Detective O'Toole observed a subject matching Defendant's description conduct what Kegel believed, based on his training and

experience, was a hand-to-hand drug transaction. *Id.* at p. 52-53. Kegel confirmed that he had worked with the CI on several prior occasions and found him to be reliable. *Id.* at pp. 44-45; 47-52.

## **CONCLUSIONS OF LAW**

A.   **Motion to Suppress Evidence (Doc. No. 32)** [5]

The sole basis of Defendant's motion to suppress evidence is that the search warrant was not supported by probable cause because the warrant relied primarily on the hearsay of an unidentified informant.

The Fourth Amendment requires that search warrants be based on probable cause. *United States v. Montes-Medina,* 570 F.3d 1052, 1059 (8th Cir. 2009). Affidavits for search warrants are reviewed using the "totality-of-the-circumstances" analysis. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The task of the issuing judge is to make "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the [judge] had a substantial basis for . . . concluding that

---

[5] Based on the record before the court, it appears that Defendant has abandoned his motion to suppress statements. As noted above, Defendant initially asserted that certain unspecified statements were taken in violation of his Fifth Amendment rights. At the evidentiary hearing held on March 27, 2014, Defendant was directed to specify the statements and evidence Defendant wanted suppressed. Although Defendant's subsequent motion to suppress under *Franks v. Delaware* specified the evidence Defendant seeks to have suppressed, Defendant failed to identify any statement Defendant believed to have been taken in violation of his constitutional rights. Based on my review of the record, it appears that the only statements at issue are (i) a statement overheard by officers between Defendant and his girlfriend while officers were executing the search warrant; and (ii) Defendant's statement to officers that he did not live at the Residence after he was advised of the search warrant. The former does not implicate the Fifth Amendment as it was not made to law enforcement officers. The court will not consider the latter statement because the United States indicated in its response to the Motion to Suppress that it had no intention of introducing the latter statement at trial. *See* Doc. No. 34, at p. 34.

probable cause existed." *Id.* at 238-39 (internal quotation marks omitted); *see also Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). When the judge relied solely on the affidavit presented to him or her, "'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) (quoting *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982)). Affidavits must be read in "a commonsense and realistic fashion." *United States v. Caldwell*, 864 F.2d 71, 74 (8th Cir. 1988) (citation omitted). "Deference is accorded an issuing [judge's] probable cause determination . . . ." *United States v. Brown*, 584 F.2d 252, 256 (8th Cir. 1978).

Probable cause exists when "there are sufficient facts to justify the belief by a prudent person that contraband or evidence of a crime will be found in the place to be searched." *United States v. Bieri*, 21 F.3d 811, 815 (8th Cir. 1994); *Gates*, 462 U.S. at 238. "'Probable cause requires only a showing of fair probability, not hard certainties.'" *United States v. Tripp*, 370 F. App'x. 753, 757 (8th Cir. 2010) (quoting *United States v. Hudspeth*, 525 F.3d 667, 676 (8th Cir. 2008)).

### 1. The Affidavit Supports a Finding of Probable Cause

"An affidavit based on hearsay 'is not to be deemed insufficient on that score, so long as a substantial basis for crediting the hearsay is presented.'" *Tripp,* 370 F.App'x at 757 (quoting *Gates,* 462 U.S. at 241-42)). Furthermore, "[w]hen an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause." *United States v. Revivich*, 793 F.2d 957, 959 (8th Cir. 1986) (citing *Gates*, 462 U.S. at 230, and *United States v. Ross*, 713 F.2d 389, 393 (8th Cir. 1983)); *see also United States v. McAtee*, 481 F.3d 1099, 1102 (8th Cir. 2007). "It is well settled that the statements of a reliable informant can

provide, by themselves, a sufficient basis for the issuance of a warrant." *United States v. Pressley*, 978 F.2d 1026, 1027 (8th Cir. 1992) (citing *McCray v. Illinois*, 386 U.S. 300 (1967)).

Under Eighth Circuit precedent, there are several factors the court should consider in determining whether information is reliable. For example, "an informant's tip can be sufficient to establish probable cause if the informant 'has a track record of supplying reliable information' or if the tip ''is corroborated by independent evidence.'" *United States v. Gabrio*, 295 F.3d 880, 883 (8th Cir. 2002) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)). Reliability may be found on the basis that past tips have led to seizures of contraband or other evidence. *United States v. Formaro*, 152 F.3d 768, 770 (8th Cir. 1998); *Gladney*, 48 F.3d at 313; *Williams*, 10 F.3d at 594. The Eighth Circuit has also noted that "there are indicia of reliability in 'the richness and detail of a first-hand observation.'" *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (quoting *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990); *see also Gates*, 462 U.S. at 234 (finding that an informant's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight"); *Williams*, 10 F.3d at 594 (noting that source's information was timely and "based on the informant's first-hand observations, not merely from rumor or innuendo"). Furthermore, "'[s]tatements against the penal interest of an informant typically carry considerable weight' in establishing reliability." *Buchanan,* 574 F.3d at 561-62 (quoting *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001)). "The circumstances of personal questioning may also enhance reliability and credibility." *Id.* at 562; *see also United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994) (stating the reliability of a tip is enhanced when a law enforcement officer meets personally with the informant to assess his credibility). Finally,

"[p]robable cause can be established when information from one informant is consistent with that of a second, independent informant." *Buchanan*, 574 F.3d at 562.

Here, not only did the Affidavit specifically provide that the CI had proven reliable in the past, but the Affidavit also contained other indicia of reliability. For example, the CI had seen narcotics and firearms in Defendant's possession at the Residence up to and including the day before the search warrant was obtained. The CI had been present inside the Residence on multiple occasions. SLMPD officers also had an opportunity to assess the CI's credibility because the information was provided in person. In addition, the CI's statements were against his penal interest as he explained, in detail, how he purchased illegal controlled substances from Defendant. Finally, the CI's information was corroborated both by information provided by another anonymous source (the DEA Source) and by the SLMPD's detectives' investigation.

For example, the Affidavit indicated that before meeting with the CI, O'Toole had previously been in contact with an anonymous source who, like the CI, advised Detective O'Toole that Defendant was distributing controlled substances from and possessing firearms inside the Residence. Like the CI, the DEA Source also stated that Defendant was known as "Nephew." The DEA Source also provided O'Toole with a detailed description of Defendant, which eventually matched up with the CI's identification of Defendant. As such, the CI's information was reliable and, standing alone, supplied sufficient probable cause for issuance of the warrant.

Information from the CI and DEA Source was further corroborated by the officers' own investigation. The Affidavit indicates that a computer check revealed Defendant's notable criminal history and that Detective O'Toole conducted a utilities check of that address, which confirmed that Defendant resided there. Perhaps most significantly, consistent with the

information received, the officers observed an individual matching Defendant's physical description exit the apartment and conduct what the officers believed to be hand-to-hand drug transactions with various individuals over a three-day period.

The officers' independent corroboration bolsters the reliability and credibility of the anonymous source's and CI's information and the finding of probable cause. Indeed, "an informant who is correct about some things more likely will be correct about critical unverified facts." *Revivich*, 793 F.2d at 960 (citing *Spinelli v. United States*, 393 U.S. 410, 427 (1969)); *Gates* 462 U.S. at 233-34. "Where the informant's information is at least partially corroborated, attacks upon credibility and reliability are not crucial to the findings of probable cause." *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1992).

For all of the foregoing reasons, Judge Clark's decision to issue the warrant is supported by probable clause.

### 2. The Good Faith Exception Applies Even If the Affidavit Falls Short of Establishing Probable Cause

Even if the warrant affidavit somehow fell short of supplying probable cause, the good faith exception under *United States v. Leon*, 468 U.S. 897, 922 (1984), applies. *Leon* held that evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on the search warrant issued by a neutral and detached judge need not be excluded as a matter of law. *Id.* In the absence of an allegation that the issuing judge abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. *Id.* at 926. Here, other than the request for a hearing under *Franks v. Delaware,* which is addressed below, Defendant does not even hint that other exceptions to the good faith exception articulated in *Leon* apply in this case. Indeed, they do not.

For the reasons discussed below, Defendant has not established that he is entitled a *Franks* hearing. As such, the motion to suppress should be denied.

**B. Motion for a *Franks* Hearing (Doc. 54)**

Defendant asserts that he is entitled to challenge the validity of the search warrant at an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154 (1978). Under *Franks,* a criminal defendant may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination. *See Franks,* 438 U.S. at 155-56. However, to gain such a hearing, a defendant must show both (1) that the affiant made a false statement "knowingly and intentionally" or with "reckless disregard for the truth" and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause. *See id.* at 155-56; s*ee also United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013) (affirming denial of *Franks* hearing notwithstanding district court's finding of several misrepresentations and omissions in the search warrant; stating, "the affidavit established probable cause even absent [the] misrepresentations and including the omitted information"). The Eighth Circuit has repeatedly recognized that "[t]he requirement of a substantial preliminary showing is not lightly met." *Id.* at 898 (quoting *United States v. Mathison,* 157 F.3d 541, 548 (8th Cir. 1998)).

In determining whether a defendant has made the requisite preliminary showing required by *Franks* to warrant a hearing, "[a]llegations of negligence or innocent mistake will not suffice to demonstrate reckless or deliberate falsehood." *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011) (citing *Franks*, 438 U.S. at 171). Rather, the test is "'whether, after viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or

had obvious reasons to doubt the accuracy of the information he reported.'" *Id.* (quoting *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010)).

Here, Defendant contends that there are discrepancies between the search warrant Affidavit and the officers' subsequent deposition testimony that make the "substantial preliminary showing" for an evidentiary hearing required by *Franks*. I disagree. While the factual basis of Defendant's motion is far from clear, Defendant appears to contend that O'Toole's Affidavit was false in three respects.

First, Defendant argues that O'Toole falsely asserted that Defendant has a prior conviction for Murder 1st. Defendant contends that his conviction is actually for Second Degree Murder and even if O'Toole was merely mistaken, this mistake is clearly material to the finding of probable cause and "calls into question O'Toole's competence at the simplest tasks as an investigator."

The Affidavit states:

> [A] computer inquiry of Jerry Carter . . . revealed he is a convicted felon having been convicted of "Murder 1st", and "Armed Criminal Action". Jerry Carter is currently on Parole for "Murder 2nd" and "Armed Criminal Action."

Discovery submitted by the government shows that a computer inquiry of Defendant using Case.net and REJIS, in fact, does erroneously show that Defendant was **convicted** of First Degree Murder and Armed Criminal Action in the St. Louis City Circuit Court in Cause No. 22931-00721-01 even though Defendant pleaded guilty to Second Degree Murder and Armed Criminal Action. This evidence suggests that Detective O'Toole's statement in the Affidavit that Defendant was convicted of Murder 1st was neither a knowing or intentional falsehood nor a statement made with reckless disregard for the truth as required under *Franks*. In addition, in

light of all of the other information contained in the warrant, omitting or correcting O'Toole's mistake would have no bearing on Judge Clark's finding of probable cause.

Defendant next appears to contend that O'Toole fabricated the anonymous source referenced in the Affidavit to create probable cause without disclosing the DEA's investigation. This is nonsense. In the Affidavit, Detective O'Toole makes clear that he received information from two different sources: an anonymous source who provided information about Defendant on May 21st and a confidential informant who had previously worked with Detective Kegel. In his deposition O'Toole testified, consistently with the Affidavit, that Defendant first became a target when O'Toole received information from the DEA Source on May 21st. O'Toole went on to explain that, although the information he received came from the anonymous source, the initial call came from a DEA agent who was working with the source. Although it is clear from the deposition testimony that Detective O'Toole did not reveal all that he knew about the DEA Source in his Affidavit, there is nothing nefarious about this omission. To the contrary, it appears that the omitted information, which includes what O'Toole learned through the DEA investigation, would serve only to further bolster the reliability and credibility of the anonymous source and O'Toole's statements in the Affidavit.

It is easy to understand how O'Toole's decision to omit the information about the DEA investigation may leave one reading the Affidavit with the mistaken impression that O'Toole was contacted directly by the DEA Source. However, that "mistake" is of no moment to the analysis under *Franks* because, even if it arguably renders the Affidavit inaccurate, it does not rise to the level of a reckless or deliberate falsehood, as required under *Franks*. Perhaps more importantly, correcting the "mistaken impression" by including in the Affidavit the omitted

information about the DEA's investigation would only bolster Judge Clark's probable cause finding, not undermine it.

Finally, Defendant appears to contend that the deposition testimony reveals that, in order to create probable cause, Detective O'Toole intentionally misrepresented what he observed when he conducted surveillance on the Residence. This argument lacks merit and is unsupported by the evidence of record. Regarding the surveillance Detective O'Toole conducted on May 21 and 22, 2013, the Affidavit states:

> Later on May 21st, 2013 I would conduct a surveillance of 5622 Delmar Boulevard for approximately one hour during which time I observed one subject approach the west side stairwell of the building. Jerry Carter exited the third floor side entry door and walked down the steps where he met the subject and engaged in a hand to hand transaction. From prior training and experience I recognized this to be indicative of a narcotics transaction.
>
> On May 22nd, 2013 in the afternoon hours I conducted a surveillance of 5622 Delmar Boulevard for approximately thirty minutes during which time I observed two subjects approach the west side stairwell of the building. Moments later Jerry Carter exited the third floor and walked down the stairs where he met the two subjects and engaged in a hand to hand transaction. Upon completion of the transaction the two subjects left in separate directions, returning from where they had came. From prior training and experience I recognized this pattern of foot traffic to be indicative of narcotics sales.

*See* Doc. No. 56-1.

Detective O'Toole's extensive deposition testimony regarding his surveillance on May 21 and 22, 2013, was consistent with his Affidavit. In his deposition, Detective O'Toole explained that the hand-to-hand transaction he witnessed on May 21st and one of the two hand-to-hand transactions he witnessed on May 22nd were controlled buys of narcotics by the DEA Source. *See* Doc. No. 56-3, pp. 50-53, 58-64. O'Toole testified that on May 21st, he observed a controlled buy between Defendant and the DEA Source. During the controlled buy, O'Toole was about twenty yards away and was positioned where he could see what was actually transacted.

*Id.* at p. 61-62. O'Toole saw the fruits of the controlled buy when the DEA Source came back. It appeared the source had bought heroin from Defendant. *Id.* at p. 68-69.

O'Toole testified that on May 22nd he again witnessed a controlled buy/hand-to-hand drug transaction between the DEA Source and Defendant. Also on May 22nd, O'Toole observed what he believed to be a second hand-to-hand drug transaction between an unknown third person and Defendant. *Id.* at p. 69-71. O'Toole further testified that the DEA Source was present during this second uncontrolled buy and confirmed that the unidentified third party had made "a buy" from Defendant.

With respect to Detective O'Toole's surveillance on May 23rd, the Affidavit states:

Later on May 23rd, 2013 in the afternoon hours Detective Kegel and I conducted a surveillance of 5622 Delmar Boulevard for approximately one hour during which time we observed one subject approach the west side stairwell of the building. Moments later we observed a subject matching the physical description of Jerry Carter engage in a hand to hand transaction with the subject. Upon completion of the transaction the subject returned from the direction from which they had came. From prior training and experience I recognized this pattern of foot traffic to be indicative of a narcotics sale.

*See* Doc. No. 56-1.

The deposition testimony of both Detectives O'Toole and Kegel was entirely consistent with the Affidavit. O'Toole testified that when he conducted surveillance with Detective Kegel on May 23rd, he observed what he believed to be a hand-to-hand drug transaction in front of the Residence between Defendant and an unknown third party. Detective Kegel's testimony regarding the investigation, including the surveillance on May 23rd, was consistent with O'Toole's testimony.

Although Defendant's brief repeatedly asserts that deposition testimony from Detectives O'Toole and Kegel reveals inaccuracies and misrepresentations in the Affidavit, my review of those records reveals no such inaccuracies. Indeed, as the government correctly points out in its

17

brief, the only discrepancy between the Affidavit and Detective O'Toole's testimony is whether the in-person meeting among Detectives O'Toole, Kegel and the CI during which Detective O'Toole showed the CI a photograph of Defendant took place on May 22nd or May 23rd. After having initially testified that the meeting took place on May 23rd, later in the deposition Detective O'Toole testified that the meeting took place on May 22nd. In his deposition, Detective Kegel testified (consistently with the Affidavit) that the meeting with the CI took place on May 23rd. Even when this lone discrepancy is taken into account, the record before this court falls far short of the "substantial preliminary showing" for an evidentiary hearing required by *Franks*.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's motion to suppress physical evidence and statements and motion for a hearing under *Franks v. Delaware* should be denied, and the statement made by Defendant to his girlfriend during the execution of the search warrant should be admitted at trial.

Dated this 13th day of May 2014.

/s/ Shirley Padmore Mensah_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE